1

2              **UNITED STATES DISTRICT COURT**

3                 **DISTRICT OF ARIZONA**

4

5    **Sidney Ryan, *et al*.,**                    )

6              **Plaintiffs,**                     )        **2:14-cv-01145 JWS**

7        **vs.**                                   )        **ORDER AND OPINION**

8    **Mesa Unified School District and**          )        **[Re: Motions at Dockets 77 and 80]**
     **Joseph Goodman, in his individual**         )
9    **capacity,**                                 )

10             **Defendants.**                     )

11   _____

12                      **I.  MOTIONS PRESENTED**

13          Before the court are the parties' cross-motions for summary judgment filed under

14   Federal Rule of Civil Procedure 56.  The plaintiffs, Sidney Ryan, Jodi Ryan, and Jeffrey

15   Hills, move for summary judgment at docket 77, supported by a statement of facts at

16   docket 78.  The remaining defendant, Joseph Goodman ("Goodman"), opposes the

17   motion at docket 86, supported by a controverting statement of facts at docket 87.  The

18   plaintiffs reply at docket 88.

19          Goodman moves for summary judgment at docket 80, supported by a statement

20   of facts at docket 81.  The plaintiffs oppose at docket 84, supported by a controverting

21   statement of facts at docket 85.  Goodman replies at docket 89, supported by a

22   "response to plaintiffs' additional facts" at docket 90.  The plaintiffs object to this latter

23   filing at docket 91.[1]

24          Oral argument was not requested and would not assist the court.

25

26

27

28   _____

            [1]Because the court does not rely in any way on Goodman's filing at docket 90, the
     plaintiffs' objection is overruled as moot.

## II.  BACKGROUND

Sidney Ryan, K.R., and B.H. (collectively, "Plaintiffs"[2]) were members of the Mountain View High School ("Mountain View High") varsity girls softball team, coached by Goodman.  Goodman states that he dismissed Plaintiffs from the team "because of a pattern of divisive, disrespectful conduct towards other team members."[3]  Plaintiffs dispute this explanation, alleging that they were dismissed in retaliation for not conducting the pre-game team prayers that Goodman sanctioned and for First-Amendment-protected speech.[4]  This court's order at docket 21 dismissed several of Plaintiffs' claims, including all claims against the Mesa Unified School District.

The two claims that remain allege that Goodman violated Plaintiffs' rights under the Establishment Clause (Count I) and Free Speech Clause (Count III) of the First Amendment.[5]  On Count I Plaintiffs seek compensatory and punitive damages and declaratory and injunctive relief.[6]  On Count III, Plaintiffs seek only declaratory relief.[7] The court held at docket 21 that Sidney Ryan ("Ryan") lacks standing to obtain declaratory or injunctive relief because she has already graduated.[8]

---

[2]K.R. and B.H. are minors whose interests are represented in this case by plaintiffs Jodi Ryan (K.R.'s mother) and Jeffrey Hills (B.H.'s father), respectively.  The court will refer to the three former players as "Plaintiffs" for ease of reference only.  Also, the parties use initials when referencing the identities of minors; the court does the same for purposes of consistency.

[3]Doc. 23 at 5 ¶ 26.

[4]Doc. 8 at 9 ¶¶ 38-39.

[5]*Id.* at 11-13, 15-16.

[6]*Id.* at 17-18.

[7]*Id.* at 17.

[8]Doc. 21 at 7-8 n.26.

**A.     Pre-Game Team Prayers**

Goodman is a member of the LDS Church,[9] as are some players of the Mountain View High softball team.[10]  Former player Erin Manuel ("Manuel") states that before each game of the 2012 season another former player, Katie Sanders ("Sanders"), led a team prayer and Goodman was "well aware" of these prayers.[11]  Manuel states that the prayers made her and some of her teammates uncomfortable, and she objected to them on at least one occasion.  According to her, Goodman "was made aware of the objection to the team prayer, but did nothing."[12]  For his part, Goodman testified that he does not recall whether his players prayed in 2012[13] and denies that any player voiced an objection to team prayer that year.[14]

It is undisputed, however, that Sanders led team prayers before every game of the 2013 season.[15]  B.H. testified that these prayers took place in the outfield before games when the whole team was assembled.[16]  The parties dispute Goodman's involvement in these prayers.  Goodman states that he knew about them[17] but did not discuss them with the players "one way or the other."[18]  He states that he had a hands-off approach to the prayers: "if students want to have a prayer," he testified, "I'm not

---

[9]Doc. 78-1 at 2.

[10]*Id.* at 3.

[11]Doc. 78-3 at 2.

[12]*Id.*

[13]Doc. 78-1 at 47.

[14]Doc. 81-1 at 27.

[15]Doc. 78-1 at 47.  *See also* Sidney Ryan's testimony, doc. 78-6 at 2; B.H.'s testimony, doc. 78-7 at 2; K.R.'s testimony, doc. 78-8 at 7-8; Declaration of K.J., doc. 81-1 at 47 ¶ 4.

[16]Doc. 78-7 at 2-3.

[17]Doc. 78-1 at 47.

[18]*Id.* at 48.

going to stop them."[19]  Sidney Ryan ("Ryan") and Jami Wickerman ("Wickerman") tell a different story.  They state that Goodman appointed certain players as "prayer leaders."[20]  Ryan testified that Sanders was the appointed prayer leader in 2013.[21]

Ryan was the captain of the 2014 team.[22]  She testified that Goodman asked Wickerman and another player, "K.J.," to be the prayer leaders for the 2014 season.[23]  Wickerman states that Goodman approached her at practice and told her, "I feel you are a really religious person.  You would be good to be the prayer leader."[24]  Wickerman states that Assistant Coach Dave Tellef ("Tellef") observed this comment, and Tellef "indicated that he agreed with Coach Goodman about that."[25]  Goodman disputes these accounts, testifying that he "never discussed team prayer" in 2014.[26]  Yet, he admitted that before the first scrimmage of the 2014 season he "invited" Wickerman and K.J. "to get the team together to give them the opportunity to pray" before games.[27]  When asked what he meant by "invite," Goodman stated, "I asked if [they] would be willing to."[28]

---

[19]*Id.* at 49.  Assistant Coach Michael Kaff states that the "girls on the team often went into the outfield before a game, away from coaches and by themselves," but he does not know "what they did or said during that time."  Doc. 81-1 at 100 ¶ 13.

[20]Doc. 78 at 9 ¶¶ 66-69.  *But see* deposition transcript of C.R., doc. 78-2 at 5 (testifying that "[a] different person said the prayer every time.").

[21]Doc. 78-6 at 162.

[22]Doc. 78-2 at 5.

[23]Doc. 85-4 at 2.

[24]Doc. 78-4 at 2.

[25]*Id.*

[26]Doc. 78-1 at 48.

[27]*Id.* at 50; doc. 81-1 at 30.

[28]Doc. 78-1 at 50.

Ryan testified that Wickerman approached her right after Goodman asked her to be a 2014 prayer leader "because she didn't know how to pray and asked [Ryan] how."[29]  Ryan testified that she responded to Wickerman, "We're not praying this year."[30]  Ryan testified that just before the scrimmage game began Goodman asked her if she needed time before the game to have a prayer.  She states that she responded to Goodman, "We're not going to pray this year," and Goodman said nothing in response.[31]  Goodman denies that this conversation took place.[32]

Mountain View High began the 2014 softball season by traveling from Mesa to Tucson by school van for a three-day tournament.[33]  Ryan testified that Wickerman approached her before the first game of the tournament and told her that "'Goodman asked [her] to pray again,' and she didn't know how."[34]  Ryan states that she responded to Wickerman, "We're not praying" and then went to the outfield and told the team, "We're not praying this year.  Goodman wants a change, so that's going to be the change."[35]

**B.    The Van Ride to Tucson**

K.R. made a CD for the road trip to Tucson[36] that included the following songs: "Ride" by SoMo; "I Just Had Sex" by The Lonely Island; and "Hate Being Sober" by

---

[29]Doc. 85-4 at 2, 5.

[30]*Id.* at 5.

[31]*Id.* at 6.

[32]Doc. 78-1 at 48; Doc. 81 at 3 ¶ 9.

[33]Doc. 81-1 at 49.

[34]*Id.* at 77.

[35]*Id.*  C.R. also testified that Ryan put an end to the team prayers before the Tucson tournament.  Doc. 78-2 at 3-4; Doc. 87 at 11 ¶ 94.

[36]Doc. 81-1 at 54

1  Chief Keef.[37]  The lyrics to "I Just Had Sex" include: "I just had sex and it felt so good /

2  A woman let me put my penis inside of her."[38]  And the lyrics to "Ride" include: "My

3  body on your body, baby, sticking like some glue / Naughty / Let's get naughty / Girl, it's

4  only one or two / The fever's fucking running / Feel the heat between us two."[39]

5  Goodman, who was driving the van in which Plaintiffs were passengers, testified that he

6  had to skip some songs on the CD because of their inappropriate lyrics.[40]  As Sidney

7  Ryan stated in a tweet, "We made a CD for our van on our way up to Tucson and coach

8  and his wife skipped 3 songs already #toodirty."[41]  Another player, "S.S.," states that

9  she saw B.H. take a photograph of another teammate, "C.R.," as she "bent over and

10  put her hands over her ears and looked very uncomfortable with the music."[42]

11  **C.   The Note**

12     Goodman testified that on the Friday night of the Tucson tournament Mountain

13  View High player "B.L." informed him that a note with a lewd message had been slid

14  under her hotel room door.  Goodman stated that he never saw the note, but B.L. told

15  him that the note included the phrase, "suck a dick."[43]  According to Goodman, B.L.

16

17  _____

18  [37]*Id.* at 193.

19  [38]Doc. 81 at 12 ¶ 78; Doc. 81-1 at 80.

20  [39]Doc. 81 at 12 ¶ 80; Doc. 81-1 at 81.

21  [40]Doc. 81-1 at 24.

22  [41]*Id.* at 199.

23  [42]*Id.* at 91 ¶¶ 15-16.

24  [43]*Id.* at 9.  Plaintiffs object that this statement is inadmissible hearsay.  Doc. 85 at 6
25  ¶ 19.  B.L's statement is not hearsay, however, because Goodman is not offering it for the truth
    of the matter asserted.  Fed. R. Evid. 801(c).  Instead, Goodman is offering B.L.'s statement to
26  establish Goodman's state of mind—that he was on notice of bullying allegations.  *See United
    States v. Leonard-Allen*, 739 F.3d 948, 954 (7th Cir. 2013) ("A witness's statement is not
27  hearsay if the witness is reporting what he heard someone else tell him for the purpose of
    explaining what the *witness* was thinking, at the time or what motivated him to do something.")
28  (emphasis in original).  The objection is overruled.

-6-

1  stated that she believed the note came from Plaintiffs and Wickerman.  Goodman

2  stated that after the note was not produced, the team had room checks and he told the

3  players to go to bed.[44]

4       Although Goodman testified that the note was one of the reasons why he

5  dismissed Plaintiffs from the team,[45] he did not discuss the note with Plaintiffs, could

6  not explain why he concluded that Plaintiffs wrote the note (and Wickerman did not),

7  and could not rule out the possibility that the note was written by a player from one of

8  the other teams staying at the hotel at that time.[46]  Goodman admitted in his deposition

9  that he did not know that Plaintiffs actually wrote the note and that he relied on B.L.'s

10  speculation without soliciting Plaintiffs' side of the story.[47]

11  **D.  The Tweet**

12       On that same Friday night B.H. tweeted "ITS WAR BITCHES" [sic] to the 254

13  followers of her Twitter account, including most members of the softball team.[48]  The

14  parties dispute the meaning of this tweet.  When asked to explain it, B.H. testified, "[A]s

15  we were walking through the hallway after we got Starbucks, [K.R.] hit [Ryan's]

16  Starbucks out of her hand and then they started arguing.  So [Ryan] tried knocking

17  [K.R.'s] out.  And I was pretty much narrating pretty much."[49]  Some of B.H.'s

18  teammates and coaches, however, interpreted B.H.'s tweet as a threat.  S.S., for

19

20  [44]Doc. 78-1 at 11.

21  [45]*Id.* at 10.

22  
23  [46]*Id.* at 9-14.  Ryan states that on the same night Plaintiffs and Wickerman also received
a note "that held sexual connotation" under their hotel room door.  Doc. 81-1 at 138.

24  [47]Doc. 78-1 at 35-36.

25  [48]Doc. 81-1 at 72-73, 130.

26  [49]*Id.* at 73.  Wickerman tells the story differently.  According to Wickerman, Ryan spilled
K.R.'s coffee.  Doc. 78-4 at 2.  Further, Wickerman states that the collision happened as Ryan
27  was "getting the key out to open the hotel room door."  Doc. 78-4 at 2 ¶ 5.  This differs from
plaintiffs' interrogatory response that states that the coffee was spilled while Plaintiffs were
28  waiting for Goodman to return with the hotel room key.  Doc. 81-1 at 181.

1  instance, stated that she thinks the tweet was directed toward herself and the rest of

2  the softball team because they were playing a game without Plaintiffs that night.[50]

3  Assistant coaches Tellef and Michael Kaff ("Kaff") also think the tweet was threatening

4  and directed at B.H.'s teammates.[51]

5  **E.    The Post-Tournament Meeting**

6      Kelly Roberts ("Roberts") is the father of two girls who played on the 2014 team.

7  He testified that he sent Goodman a text message on Saturday afternoon requesting a

8  meeting with all four of the coaches.[52]  Goodman responded by scheduling such a

9  meeting at Assistant Coach Giles Mead's ("Mead's") house.[53]  At the meeting Roberts

10  showed the coaches B.H.'s tweet.[54]  Goodman testified that, in the context of what the

11  coaching staff had observed in practice and in Tucson, they believed that "bitches"

12  referred to other members of the team.[55]  Roberts said that he also told the coaches

13  that B.H. said something negative about C.R. on Twitter during the Tucson

14  tournament,[56] and Ryan made a negative comment about another player from the

15  dugout.[57]  Roberts testified that he also told the coaches that one of his daughters had

16  mentioned that during the van ride to Tucson "there was music, that [C.R.] was in the

17

18

19

20      [50]Doc. 81-1 at 92 ¶ 25.

21      [51]*Id.* at 102 ¶ 29, 106.

22      [52]*Id.* at 111-12.

23      [53]Doc. 78-1 at 28; doc. 81-1 at 39 ¶ 26.

24      [54]Doc. 78-1 at 21; doc. 81-1 at 121.

25      [55]Doc. 78-1 at 22.

26      [56]Doc. 81-1 at 117.

27      [57]*Id.* at 121.

28

back of the van, and that [S.S.] had observed this and . . . if they wanted to speak with someone directly with direct knowledge, they needed to contact" S.S. and her parents.[58]

Goodman testified that after Roberts left Coach Mead's house he asked S.S. and her parents to come over so that he could ask her about the photographs of C.R. that B.H. may have posted on Snapchat.[59]  According to Goodman, S.S. confirmed that B.H. had taken pictures of C.R. and posted them to Snapchat.[60]  Goodman testified that S.S. "discussed how she felt like there were almost two teams," and that it "felt so divisive and how she had a lot of fun with her ten other teammates but felt like there . . . was a [clique] that was dividing the team."[61]

The meeting culminated with the coaches dismissing Ryan, B.H., and K.R. from the team.[62]  According to Assistant Coach Kaff, the coaches called the three players and notified them of their dismissal.[63]  B.H. states that Goodman dismissed her from the team for "cyber bullying" (based on her tweet) and for "not respecting religious views of others."[64]  Ryan and K.R. allege that they were dismissed for similar reasons.[65]

---

[58]*Id.* at 116.

[59]Doc. 78-1 at 28-29.

[60]Doc. 81-1 at 18-19.  *See also* S.S.'s declaration, doc. 81-1 at 93 ¶ 29 ("I went to Coach Mead's house with my parents and told the four coaches about the van ride to Tucson and [B.H.'s] tweet; I looked for the tweet at that time but could not show it to them because it had been deleted.")

[61]*Id.* at 20-21.

[62]Doc. 81 at 8 ¶ 53; 81-1 at 102 ¶ 32.

[63]Doc. 81-1 at 102 ¶ 33.

[64]Doc. 78 at 15 ¶ 124; 78-7 at 6-7.  *See also* doc. 87-2 at 13.  Jeffrey Hills, B.H.'s father, states that Goodman told him that B.H. was dismissed "for cyber bullying and not respecting religious views of others."  Doc. 78 at 8 ¶ 54; 78-9 at 2-3.

[65]*See* Ryan's deposition testimony, doc. 76-6 at 6 (Q: "did Goodman or the assistant coaches ever tell you what specific religious view was disrespected?  A: No.  Q:  Okay.  They only just said you disrespected a religious view?  A:  Yes."); doc. 81-1 at 138 (Ryan stated that "Tellaf said they need to focus on the long term of the team and we need to respect the

Goodman denies these allegations,[66] stating instead that the players were dismissed for "divisiveness," which he describes as "poor teammate behavior."[67]

### III.  STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[68]  The materiality requirement ensures that "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[69]  Ultimately, "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the nonmoving party."[70]  However, summary judgment is mandated under Rule 56 "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[71]

---

others['] religious views."); K.R.'s deposition testimony, doc. 78-8 at 9.  *See also* B.H.'s deposition transcript, doc. 87-2 at 13 (Q: What was Ryan told about why she got kicked off the team?  A: "Same thing.  Not respecting religious views and bullying.").  John Ryan, father of Ryan and K.R., states that Coach Tellaf stated, "'We have to respect everyone's religious views.'  Using this as one of the reasons being [sic] cut from the team."  Doc. 81-1 at 132.  *See also* Jodi Ann Ryan's deposition transcript, doc. 85-3 at 12-13 (testifying that Goodman stated during the meeting at Coach Mead's house that he was dismissing Ryan and K.R. from the team "for bullying and not respecting religious views.").

[66]Doc. 87 at 6 ¶ 54, 14 ¶ 124.  *See also* doc. 78-1 at 4 ("Q:  Did you claim during the 2014 season that [Plaintiffs] failed to respect religious views of other team members?  A:  I never made that claim.").

[67]Doc. 78-1 at 37.  *See also* Assistant Coach Tellef's deposition transcript, doc. 87-2 at 69; letter from Holly Williams, doc. 81-1 at 148-50.

[68]Fed. R. Civ. P. 56(a).

[69]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[70]*Id.*

[71]*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The moving party has the burden of showing that there is no genuine dispute as to any material fact.[72]  Where the nonmoving party will bear the burden of proof at trial on a dispositive issue, the moving party need not present evidence to show that summary judgment is warranted; it need only point out the lack of a genuine dispute as to any material fact.[73]  Once the moving party has met this burden, the nonmoving party must set forth evidence of specific facts showing the existence of a genuine issue for trial.[74]  All evidence presented by the non-movant must be believed for purposes of summary judgment, and all justifiable inferences must be drawn in favor of the non-movant.[75]  However, the non-moving party may not rest upon mere allegations or denials, but must show that there is sufficient evidence supporting the claimed factual dispute to require a fact-finder to resolve the parties' differing versions of the truth at trial.[76]

## IV.  DISCUSSION

**A.    Plaintiffs' Claims for Declaratory and Injunctive Relief are Moot**

At docket 92 the court, *sua sponte*, asked Plaintiffs' counsel to provide a notice indicating whether any of the plaintiffs remain at Mountain View High.  Plaintiffs' counsel informed the court that they have all graduated[77] and conceded that this moots their claims for declaratory and injunctive relief.[78]

---

[72]*Id.* at 323.

[73]*Id.* at 323-25.

[74]*Anderson,* 477 U.S. at 248-49.

[75]*Id.* at 255.

[76]*Id.* at 248-49.

[77]Doc. 93.

[78]Doc. 95.  *See C.F. ex rel. Farnan v. Capistrano Unified Sch. Dist.*, 654 F.3d 975, 983-84 (9th Cir. 2011); *Cole v. Oroville Union High Sch. Dist.*, 228 F.3d 1092, 1098 (9th Cir. 2000).

As Plaintiffs observe, however, their graduation does not moot their claims for monetary damages.[79]  The complaint seeks compensatory and punitive damages under Count I for alleged violations of the Establishment Clause.[80]  Plaintiffs also assert that they are seeking monetary damages under Count III for alleged Free Speech Clause violations,[81] despite the fact that no such request is found in the complaint.

Goodman argues that Plaintiffs' failure to plead a request for monetary damages under Count III means that the count should be dismissed in its entirety.[82]  He relies on *Doe v. Madison*, where the Ninth Circuit dismissed the plaintiffs' complaint because their claims for declaratory and injunctive relief became moot upon their graduation and they did not request monetary damages.[83]  *Doe* does not control here because Plaintiffs are requesting monetary damages,[84] albeit in their briefing and not their complaint. Rule 54(c) allows the court to award monetary damages to Plaintiffs on Count III if they prove facts entitling them to such relief, even though they failed to plead such a request in their complaint.[85]  Because Goodman does not contend that it will be prejudiced by

---

[79]*See Doe v. Madison Sch. Dist. No. 321*, 177 F.3d 789, 798 (9th Cir. 1999) ("A student's graduation moots claims for declaratory and injunctive relief, but it does not moot claims for monetary damages.").

[80]*See* the Amended Complaint, Doc. 8 at 17 ¶ A.

[81]Doc. 95 at 3.

[82]Doc. 94 at 3-4.

[83]*Madison Sch. Dist.*, 177 F.3d at 798.

[84]Doc. 95 at 3.

[85]Fed. R. Civ. P. 54(c) ("Every . . . final judgment [other than a default judgment] should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings.").  *See Z Channel Ltd. P'ship v. Home Box Office, Inc.*, 931 F.2d 1338, 1341 (9th Cir. 1991) ("It is clear that Z Channel did not foreclose relief in damages by failing to ask for them in its Count One prayer.") (citing *Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 66 (1978) ("[A] meritorious claim will not be rejected for want of a prayer for appropriate relief"); *Western District Council v. Louisiana Pacific Corp.*, 892 F.2d 1412, 1416-17 (9th Cir. 1989); *Sias v. City Demonstration Agency*, 588 F.2d 692, 696 (9th Cir. 1978); *Sapp v. Renfroe*, 511 F.2d 172, 176 n.3 (5th Cir.1975)).  *See also* 10 CHARLES ALAN WRIGHT AND ARTHUR R. MILLER,

Plaintiffs' failure to demand monetary damages under Count III, Plaintiffs are not foreclosed from pursuing that relief.[86]

## B.  Establishment Clause Claims

The First Amendment's Establishment Clause prohibits the government from supporting or becoming actively involved in religious activity.[87]  In *Lee v. Weisman*, the Supreme Court considered an Establishment Clause challenge to prayers that were delivered as part of graduation ceremonies for public middle and high school students.[88] *Lee* adopted what has become known as "the coercion test" for determining whether school prayer violates the Establishment Clause.  Under this test, a government action violates the Establishment Clause if it attempts to "persuade or compel a student to participate in a religious exercise."[89]  Applying this test, the court struck down the prayers, even though attendance at the graduation ceremonies was optional.  Noting that adolescents are particularly susceptible to public and peer pressure, the Court held that "subtle coercive pressures" rendered the students' attendance obligatory "in a fair

---

FED. PRAC. & PROC. CIV. § 2664 (3d ed.) ("WRIGHT & MILLER") ("Because of the second sentence of Rule 54(c), the demand for judgment required by Rule 8(a)(3) loses much of its significance once a case is at issue.  If defendant has appeared and begun defending the action, adherence to the particular legal theories of counsel that may have been suggested by the pleadings is subordinated to the court's duty to grant the relief to which the prevailing party is entitled, whether it has been demanded or not."); *Illinois Physicians Union v. Miller*, 675 F.2d 151, 158 (7th Cir. 1982) ("It is well-settled that the district court may grant monetary relief in declaratory judgment proceedings, even without a specific request.").

[86]10 WRIGHT & MILLER § 2664 ("The only exception to [Rule 54(c)] is if plaintiff's failure to demand the appropriate relief has prejudiced the defendant.") (collecting cases).

[87]*See* U.S. CONST. amend. I; *Lemon v. Kurtzman*, 403 U.S. 602, 612 (1971).

[88]505 U.S. 577, 580 (1992).

[89]*Id.* at 599.  *See also id.* at 587 ("[T]he Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise."); *id.* at 591-92 ("[I]n the hands of government what might begin as a tolerant expression of religious views may end in a policy to indoctrinate and coerce.").

1  and real sense."[90]   The Court stated that "[i]t is a tenet of the First Amendment that the

2  State cannot require one of its citizens to forfeit his or her rights and benefits as the

3  price of resisting conformance to state-sponsored religious practice."[91]

4         The Supreme Court applied the coercion test most recently in *Santa Fe*

5  *Independent School District v. Doe*.[92]  *Santa Fe* involved student "invocations" that were

6  broadcast before football games.  The school district authorized the invocations,

7  allowed only one student to give them, limited their content to "only those messages

8  deemed 'appropriate'" under the school district's policy,[93] and broadcast them over the

9  school's public address system "as part of a regularly scheduled, school-sponsored

10  function conducted on school property."[94]  Under the circumstances the Court

11  concluded that the prayers were public speech, not private, because an objective

12  student would perceive them "as stamped with her school's seal of approval."[95]  Further,

13  the Court held that even though attendance at the football games was optional, the

14  prayers were coercive because high school students either feel "immense social

15  pressure" or have "a truly genuine desire" to be involved in high school football games.[96]

16  For many students, the Court reasoned, "the choice between attending these games

17  and avoiding personally offensive religious rituals is in no practical sense an easy one.

18

19

20  [90]*Id.* at 586, 88.

21  [91]*Id.* at 596.

22  [92]530 U.S. 290, 302 (2000).

23  [93]*Id.* at 303-04.

24  [94]*Id.* at 307.

25  [95]*Id.* at 308.  *See also id.* at 310 ("The delivery of . . . a [religious] message—over the
26  school's public address system, by a speaker representing the student body, under the
   supervision of school faculty, and pursuant to a school policy that explicitly and implicitly
27  encourages public prayer—is not properly characterized as 'private' speech.").

28  [96]*Id.* at 311.

The Constitution . . . demands that the school may not force this difficult choice upon these students . . . ."[97]

Plaintiffs argue that they are entitled to summary judgment on their Establishment Clause claim because Goodman dismissed them from the team, in part because they did not engage in team prayer.  This argument lacks merit because the reason for Plaintiffs' dismissal is a disputed question of fact.

Goodman argues that he is entitled to summary judgment for two reasons.  First, he argues that the prayers that Ryan prevented would have been private speech because they would have been conducted by students.  Goodman contends that "he was not involved with the players' pre-game meetings and did not know what occurred during that time."[98]  This contention falls flat because Goodman testified that he asked Wickerman and K.J. if they would be willing to get the 2014 team together so that they could pray before games.  An objective student would perceive this request as Goodman stamping team prayer with the school's approval, making the prayers public speech.[99]

Second, Goodman argues that Plaintiffs cannot establish they were harmed because there is no evidence showing that Goodman knew that Plaintiffs had ended the prayers or that he used that as a reason for dismissing Plaintiffs from the team.[100] This argument lacks merit as well.  As noted above, whether "not respecting religious views" was one of the reasons for Plaintiffs' dismissal is a disputed question.  Although

---

[97]*Id.* at 312.

[98]Doc. 80 at 6.  *See also* doc. 86 at 4 ("When players gathered before games, they gathered in private and without any participation from coaches or members of the public."); doc. 89 at 5 ("Goodman did not participate in the players' pre-game meeting or review what any of the players said on the issue of player prayer.").

[99]*See Santa Fe*, 530 U.S. at 308.

[100]Doc. 80 at 6-7.

1  Goodman denies it,[101] Plaintiffs have submitted evidence to the contrary.[102]  Plaintiffs

2  argue that "not respecting religious views" was a veiled reference to Plaintiffs' decision

3  to end the team prayers, and establishes that Plaintiffs were retaliated against for

4  asserting their First Amendment rights.[103]  If the jury believes Plaintiffs' evidence, it

5  could reasonably infer that "not respecting religious views" was a reference to Plaintiffs'

6  role in ending the prayers.[104]

7      Whether Goodman had reason to connect Plaintiffs to the end of the team

8  prayers is another disputed question.  With regard to Ryan, the dispute is clear: Ryan

9  testified that she told Goodman that the team was not going to pray before games in

10  2014, and Goodman denies that this conversation occurred.  With regard to K.R. and

11  B.H., Plaintiffs have not submitted evidence showing a direct connection between them

12  and the end of the prayers.  But, if the jury believes Ryan's testimony, it could

13  reasonably find that Goodman connected K.R. and B.H. to that decision indirectly

14  based on their close friendship with and support of Ryan.[105]  In sum, a jury could

---

[101]Goodman denies this.  *See* Doc. 87 at 8 ¶ 63.

[102]*See* Doc. 81-1 at 132; Doc. 85-3 at 12-13; Doc. 87-2 at 13 lns. 13-18.  For example, Jodi Ann Ryan testified that Goodman initially cited "bullying and not respecting religious views" as his reasons for dismissing the three players.  Doc. 85-3 at 12 lns. 12-21.  Jeffrey Hills, B.H.'s father, said the same thing.  Doc. 78-9 at 2; Doc. 78-9 at 3 (testifying that Goodman told him that he cut B.H. for cyber bullying and for not respecting the religious views of others).

[103]Doc. 77 at 3.

[104]*See, e.g.,* K.R.'s deposition testimony, Doc. 78-8 at 9 (Q. "Do you believe you were dismissed from the team because you expressed an opinion to not have team prayer . . . before the Seton scrimmage or at the Tucson tournament?  A. Yes.  Q. Okay.  Why do you feel that way?  A.  Because Tellef said that it was because we weren't respecting religious views and that is the only thing religious . . . is praying.").

[105]Goodman testified that Plaintiffs were part of a clique.  Doc. 81 at 1-2 ¶ 1.  Jeffrey Hills testified that he thinks that Goodman dismissed B.H. "because [Ryan] said no more prayer and [B.H.] supported her."  Doc. 78-9 at 2.  Jodi Ann Ryan testified that K.R. "just got pulled into this whole thing because she's [Ryan's] sister."  Doc. 85-3 at 13.

1   reasonably find that Goodman had reason to connect all three plaintiffs to the end of

2   the team prayers and punished them for doing so.

3        Finally, Goodman argues that he is entitled to qualified immunity on Plaintiffs'

4   Establishment Clause claims.[106]  This argument lacks merit because it relies on the

5   court resolving in his favor the disputed questions of fact mentioned above.

6   **C.     Free Speech**

7        Public school students do not "shed their constitutional rights to freedom of

8   speech or expression at the schoolhouse gate."[107]  At the same time, because of the

9   important need for school officials to control school activities,[108] students' free speech

10  rights are "not automatically coextensive with the rights of adults in other settings."[109]

11  School officials "need not tolerate student speech that is inconsistent with its basic

12  educational mission, even though the government could not censor similar speech

13  outside the school."[110]

14       *Tinker*, the seminal student speech case, held that school officials may not

15  suppress speech unless it "materially and substantially interfere[s] with the

16  requirements of appropriate discipline in the operation of the school."[111]  Since *Tinker*,

17  however, the Supreme Court has allowed schools to impose certain content-based

---

22       [106]Doc. 86 at 9-10.

23       [107]*Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503, 506
24  (1969).

25       [108]*Id.* at 507.

26       [109]*Bethel School Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986).

27       [110]*Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988) (quotation omitted).

28       [111]*Tinker*, 393 U.S. at 509 (quotation omitted).

1   restrictions on student speech, including speech that is "vulgar," "lewd," and "plainly

2   offensive"[112] and speech that encourages illegal drug use.[113]

3        Plaintiffs allege that Goodman punished them for two forms of protected speech:

4   the music on K.R.'s CD and B.H.'s tweet.[114]  Goodman counters that the music is not

5   protected because the lyrics are vulgar and promote illegal drug use,[115] and the tweet is

6   not protected because he reasonably determined that the tweet was disruptive to

7   school activities.[116]

8        **1.   K.R.'s music is not protected speech**

9        In *Fraser*, the Supreme Court rejected a high school student's argument that his

10  sexual-innuendo-laden campaign speech was protected speech.[117]  The Court held that

11  the "substantial disruption" analysis prescribed by *Tinker* does not apply where the

---

[112]*Fraser*, 478 U.S. at 685 ("The First Amendment does not prevent the school officials from determining that to permit a vulgar and lewd speech such as respondent's would undermine the school's basic educational mission.").

[113]*Morse v. Frederick*, 551 U.S. 393, 397 (2007).

[114]Doc. 8 at 7-8 ¶¶ 28-32.  Plaintiffs appear to also argue that the allegedly vulgar note and the photos that were allegedly taken of C.R. are protected speech.  Doc. 77 at 11.  The court need not consider these arguments because no such claims are found in the complaint, and plaintiffs abandon them in reply.  *See* doc. 88.  *See also* Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 574 (2007).

[115]Doc. 80 at 9-10.

[116]*Id.* at 10-13.

[117]*Fraser,* 478 U.S. at 687 (Brennan, J., concurring) ("I know a man who is firm—he's firm in his pants, he's firm in his shirt, his character is firm—but most . . . of all, his belief in you, the students of Bethel, is firm . . . . Jeff Kuhlman [the candidate] is a man who takes his point and pounds it in.  If necessary, he'll take an issue and nail it to the wall.  He doesn't attack things in spurts, he drives hard, pushing and pushing until finally—he succeeds . . . . Jeff is a man who will go to the very end—even the climax, for each and every one of you . . . . So vote for Jeff for A.S.B. vice-president—he'll never come between you and the best our high school can be.").

-18-

speech is vulgar, lewd, and plainly offensive.[118]  When confronted with speech of that nature, the Court ruled, schools are within their authority to "make the point to the pupils that vulgar speech and lewd conduct is wholly inconsistent with the fundamental values of public school education."[119]

Goodman argues that the court should analyze K.R.'s music under *Fraser*, not *Tinker*, because several songs contain vulgar, sexually explicit lyrics.[120]  To support this argument, he points to K.R.'s testimony that the lyrics to "I Just Had Sex" would be inappropriate in a school setting,[121] B.H.'s admission that some of the CD's songs "talk graphically in terms of sexual acts,"[122] and Ryan's admission that the lyrics to "I Just Had Sex" and "Ride" are inappropriate for school-related activities because they are "vulgar."[123]

Plaintiffs' correctly note that this court, not Goodman or the plaintiffs themselves, must determine whether the songs can be reasonably construed as vulgar and offensive.[124]  Plaintiffs argue that the court should take into account the fact that the listeners were high school students who "are well familiar with the concept of love and

---

[118]*Id.* at 685.  *See also Morse*, 551 U.S. at 405 ("Whatever approach *Fraser* employed, it certainly did not conduct the 'substantial disruption' analysis prescribed by *Tinker*.").

[119]*Id.* at 685-86 (quotation omitted).

[120]Doc. 80 at 10.

[121]Doc. 81-1 at 59.

[122]Doc. 81-1 at 71.

[123]Doc. 81-1 at 80-82.

[124]*See Chandler v. McMinnville Sch. Dist.*, 978 F.2d 524, 530 (9th Cir. 1992) (reversing the dismissal of a complaint where the school officials failed to show that certain speech could be reasonably considered "per se vulgar, lewd, obscene, or plainly offensive within the meaning of *Fraser*."); *B.H. ex rel. Hawk v. Easton Area Sch. Dist.*, 725 F.3d 293, 308 (3d Cir. 2013) ("It remains the job of judges . . . to determine whether a reasonable observer could interpret student speech as lewd, profane, vulgar, or offensive.") (citing *Morse*, 551 U.S. at 402).

1  sex."[125]  In this context, Plaintiffs contend, the songs cannot reasonably be considered

2  lewd or vulgar because they "exist in American pop culture" and high school students

3  listen to them and similar songs on a daily basis.[126]

4      Plaintiffs' arguments confuse the rights that students enjoy at home and the

5  rights they enjoy in a school setting.  As the Supreme Court observed in *Fraser*, public

6  schools bear a responsibility to "inculcate the habits and manners of civility" and teach

7  students "the boundaries of socially appropriate behavior."[127]  Given these

8  responsibilities, "offensive speech that would receive full constitutional protection if

9  used by an adult in public discourse may, consistent with the First Amendment, give

10  rise to disciplinary action by a school."[128]

11      For instance, in *R.O. ex rel. Ochshorn v. Ithaca City School Dist.*, the plaintiffs

12  argued that their First Amendment rights were violated when their school prohibited

13  them from publishing a cartoon that contained drawings of stick figures in sexual

14  positions.[129]  The Second Circuit had little difficultly rejecting this argument, noting that

15  under *Fraser* a school may categorically prohibit lewd, vulgar, or profane speech.[130]

16

17

18

19

---

20      [125]Doc. 84 at 13.  *See also* Doc. 88 at 6 (citing *Walker-Serrano ex rel. Walker v.*

21  *Leonard*, 325 F.3d 412, 416-17 (3d Cir. 2003) ("There can be little doubt that speech
    appropriate for eighteen-year-old high school students is not necessarily acceptable for

22  seven-year-old grammar school students.  Human sexuality provides the most obvious example
    of age-sensitive matter . . . .").

23

24      [126]Doc. 88 at 4-5.

25      [127]*Fraser*, 478 U.S. at 681.

26      [128]*Doninger v. Niehoff*, 642 F.3d 334, 344 (2nd Cir. 2011).

27      [129]645 F.3d 533, 536 (2nd Cir. 2011).

28      [130]*Id.* at 542-43.

1  The court held that the drawings "clearly qualify as 'lewd'" because they "'incit[ed] to
2  sensual desire or imagination.'"[131]

3     Because it is undisputed that the songs at issue in this case were played in a
4  school environment, and those songs contain plainly lewd lyrics, under the standards
5  set out in *Fraser*, they are not entitled to First Amendment protection.  Goodman will be
6  granted summary judgment on Plaintiffs' First Amendment claims based on the songs.

7        **2.    Goodman is entitled to qualified immunity regarding B.H.'s tweet**

8     The parties agree that the test set out in *Tinker* applies to B.H.'s tweet,[132] but
9  differ as to whether the tweet was so disruptive to the school environment that it lost its
10  First Amendment protection.  Goodman interprets the tweet as a threat directed toward
11  other players on the team that disrupted team morale and created a hostile
12  environment.[133]  Plaintiffs view it differently, arguing that the tweet was so generic that it
13  is impossible to discern its target—it could have been about anything, "two professional
14  sports players, two celebrities, [or] two politicians."[134]  Further, Plaintiffs submit evidence
15  that the tweet concerned a spilled coffee and argue that the meaning of the tweet
16  presents a question of fact that precludes summary judgment.  But because Goodman
17  is entitled to qualified immunity, there is no need to determine the actual meaning of the
18  tweet or whether any discipline that Goodman meted out on its account violates the
19  First Amendment.[135]

20

21  [131]*Id.* at 543 (quoting MERRIAM WEBSTER'S THIRD NEW INT'L DICTIONARY 1147 (1st ed.
22  1981)).

23  [132]Doc. 77 at 11; doc. 80 at 11.  *See also Tinker*, 393 U.S. at 513 ("[C]onduct by the
   student, in class or out of it, which for any reason—whether it stems from time, place, or type of
   behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights
24  of others is, of course, not immunized by the constitutional guarantee of freedom of speech.").

25  [133]Doc. 80 at 11-12.

26
   [134]Doc. 84 at 11.
27

28  [135]*Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("The judges of the district courts and
   the courts of appeals should be permitted to exercise their sound discretion in deciding which of

1   "The defense of 'qualified immunity' requires courts to enter judgment in favor of

2   a government employee unless the employee's conduct violates 'clearly established

3   statutory or constitutional rights of which a reasonable person would have known.'"[136]  It

4   is designed to protect "all but the plainly incompetent or those who knowingly violate the

5   law."[137]  In determining whether a government official is entitled to qualified immunity

6   the court must consider "(1) whether, taking the facts in the light most favorable to the

7   nonmoving party, the government official's conduct violated a constitutional right, and

8   (2) whether the right was clearly established at the time of the alleged misconduct."[138]

9   "If the answer to either is 'no,' the official cannot be held liable for damages."[139]

10       Goodman cites *Doninger v. Niehoff*, where a student was disciplined after

11  publishing a message on her blog that stated that a school concert had been cancelled

12  and encouraged other students to contact a school official about it to "piss her off."[140]

13  An en banc Second Circuit panel held that the school official was entitled to qualified

14  immunity because the post's First Amendment protection was not clearly established.

15  Despite the presence of various factual disputes, the court held that summary judgment

16  was warranted because the second prong of the qualified immunity doctrine asks

17  whether school officials were "objectively unreasonable" in portending significant

18

19

20

21  ──────────────

    the two prongs of the qualified immunity analysis should be addressed first in light of the

22  circumstances in the particular case at hand.").

23      [136]*Morse*, 551 U.S. at 429 (2007) (Breyer, J., concurring) (quoting *Harlow v. Fitzgerald*,

24  457 U.S. 800, 818 (1982)).

25      [137]*Malley v. Briggs*, 475 U.S. 335, 341 (1986).

26      [138]*Farnan*, 654 F.3d at 986.

27      [139]*Id*.

28      [140]642 F.3d 334, 340-41 (2nd Cir. 2011).

disruption from the blog post,[141] and the officials' decision was not objectively unreasonable.[142]

Goodman also relies on *Lowery v. Euverard*, where four high school football players challenged their dismissal from the team after they circulated a petition to replace the head coach.[143]  The district court denied the defendants' summary judgment motion on qualified immunity grounds, holding that whether the petition disrupted the team was an issue of disputed material fact under *Tinker*.  The Sixth Circuit reversed, holding that the question was not whether the petition actually disrupted the team, but rather, whether it was reasonable for the coach to have forecasted a disruption.[144]  Further, the court held that a fear that the petition would harm "team unity, by dividing the team into groups who support the coach and groups who don't," was sufficient under *Tinker* to justify regulation of the speech.[145]

Plaintiffs rely primarily on *Pinard v. Clatskanie Sch. Dist. 6J*[146] and *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*[147]  In *Pinard*, high school basketball players brought an action challenging their suspension from the team for speaking out against their coach.  The coach had told the players "that if they wanted him to quit, they should say

---

[141]*Id.* at 349.

[142]*Id.* at 351.

[143]497 F.3d 584, 586 (6th Cir. 2007).

[144]*Id.* at 592.  *See also id.* at 593 ("[T]he Court must evaluate the circumstances to determine if Defendants' forecast of substantial disruption was reasonable.").

[145]*Id.* at 593.  *See also id.* at 596 ("For Euverard and the other coaches to have turned a blind eye to a potential threat to team unity would have been a grave disservice to the other players on the team.").

[146]467 F.3d 755 (9th Cir. 2006).

[147]650 F.3d 915 (3rd Cir. 2011).

so, and he would resign."[148]  After the players responded by typing up a petition seeking the coach's ouster, they were suspended.  The Ninth Circuit held that the players' petition was protected speech under *Tinker* "because it could not reasonably have led school officials to forecast substantial disruption of or material interference with a school activity."[149]  *Pinard* is not on all fours with the case at bar, however, because the coach there did not submit any evidence that he suspended the players out of concern that the speech would disrupt school activities or impinge on the rights of other students.[150]

In *Blue Mountain*, a student was suspended for creating a mock MySpace profile that used foul language and sexually explicit content to make fun of her middle school principal.[151]  Although the profile contained the principal's photograph, it did not mention him by name.  "The profile was presented as a self-portrayal of a bisexual Alabama middle school principal named 'M–Hoe.'  The profile contained crude content and vulgar language, ranging from nonsense and juvenile humor to profanity and shameful personal attacks aimed at the principal and his family."[152]  The Third Circuit rejected the school officials' argument that the profile was not protected because they reasonably feared that it would cause a substantial disruption.  This case is also differentiable from the case at bar because *Blue Mountain* based its holding on the fact that the profile "was so outrageous that no one could have taken it seriously."[153]  Here, B.H.'s tweet

---

[148]*Id.* at 760.

[149]*Id.* at 759.

[150]*Id.* at 768.

[151]650 F.3d at 920.

[152]*Id.*

[153]*Id.* at 930.  *See also id.* at 929 ("[T]he profile, though indisputably vulgar, was so juvenile and nonsensical that no reasonable person could take its content seriously.").

might have been cryptic, but it was not so outrageous that a reasonable viewer could not have interpreted it as serious.

The message behind B.H.'s tweet is difficult to discern.  A reasonable coach in Goodman's position might have brushed the tweet off as nonsense, or a harmless message directed at a friend or no one in particular.  Goodman thought the tweet was directed toward other players—in other words, that B.H. was declaring war on some of her teammates—and feared that it would cause a substantial disruption to team unity or harm the individual players who believed they were targeted.  (These disruptions would be sufficient under *Tinker* to justify discipline.[154])  In the context of qualified immunity, the court's role is not to agree or disagree with Goodman's interpretation of the tweet, but rather to determine whether his interpretation was objectively unreasonable.  Given the timing of the tweet and the evidence that shows that a clique had developed on the team, the court cannot conclude that Goodman's interpretation of the tweet was objectively unreasonable.[155]  Qualified immunity shields him from liability.

## V. CONCLUSION

Based on the preceding discussion, Plaintiffs' motion for summary judgment at docket 77 is DENIED, and Goodman's motion for summary judgment at docket 80 is GRANTED in part and DENIED in part as follows: Goodman's motion for summary

---

[154]*See Lowery*, 497 F.3d at 600-01 ("It was reasonable for Defendants to forecast that Plaintiffs' petition would undermine [the coach's] authority and sow disunity on the football team.  Thus, there was no constitutional violation in Plaintiffs' dismissal from the team."); *Kowalski v. Berkeley Cty. Sch.*, 652 F.3d 565, 572 (4th Cir. 2011) ("[S]chool administrators must be able to prevent and punish harassment and bullying in order to provide a safe school environment conducive to learning.").

[155]*See Doninger*, 642 F.3d at 351.  *See also Morse*, 551 U.S. at 401 (Breyer, J., concurring).

judgment on Plaintiffs' claim for monetary damages under Count I is DENIED.  In all other respects, Goodman's motion is GRANTED.

DATED this 19th day of July, 2016.

/s/ JOHN W. SEDWICK
SENIOR JUDGE, UNITED STATES DISTRICT COURT